Equipment Company v. Dual Trucking and Equipment Company v. Dual Trucking and Equipment Company O.K. Mr. Fondren. Good morning, Your Honors. May it please the court. We appeal today the grant of summary judgment by the trial court, who erred in doing so in two important ways. First, by failing to acknowledge a material issue of fact created by my client's affidavit, which the trial court, in reasons for judgment, explicitly stated was not considered. Secondarily, in finding valid assuranceship or guarantee agreement used interchangeably, which is facially invalid. I'll start, Your Honors, indulge me with first the material issues of fact. There are two lines of cases that have been cited, and the court is well aware of that. One line of cases applied on tractor and equipment side, a general analysis, I'll call it, of Louisiana contractual code articles in attempting to enforce contracts of suretyship. A second line of cases cited by the appellants, Mr. Alford, in those cases there was a more strict analysis and more evidence considered, most particularly extrinsic evidence regarding the intent of the putative surety, which we believe are more appropriate in this case. So why the differences? Why the different line of thought? Well, there are some inconsistencies in the reasoning of the cases, to be sure, but what I can pretty much boil it down to is that in the cases that follow our line of reasoning, there are two common threads. One, little or no information regarding the putative surety filled in on either the contract as a whole and or the guarantee itself, and secondarily, a very high level of integration, saving one case, between the guarantee portion of the agreement and the entire application or contract itself. One thing I'd like to point out is that in both lines of cases, reading the guarantees that were set forth in those cases, regardless of which side the case is on, every single guarantee cited by both sides has more clear language than the one that your honors are looking at today, every single one. In the cases cited by Tractor and Equipment, all saving the American Bank case lacked the a evidentiary basis, an evidentiary basis for the court to launch into the type of analysis that it did in Pelican Plumbing, which is the case most analogous, and in fact, the case of Veterans Properties v. Barry cited by the trial court, also a Fifth Circuit case like the Pelican Plumbing case, explicitly acknowledged that its ruling seemed inconsistent with Pelican Plumbing, while at the same time, went out of its way to say, we do not overrule Pelican Plumbing. We have no evidentiary basis in our case to do the type of analysis that was done in Pelican Plumbing. For whatever reason there was, the appellate court, the Fifth Circuit in that case, found that there was no record of the proceedings, no transcript, no evidentiary basis upon which to evaluate the credibility of the surety, putative surety, who was denying that he intended to sign in his personal capacity rather than his representative capacity, and said in Pelican Plumbing, in fact, that existed. The unlike in the case we have today — But you don't even get to that if the documents on their face are clear, do we? If the document on its face is clear, that is true. In the cases, say that. The trial court in this case — Well, in this case, Alford signed only in a separate box that said personal guarantee. Isn't that right? That is correct. Did not sign on the signature block for a corporate representative. It is correct that he signed on the wrong block. And what I would point out is that there were — there was not just one block. If, Your Honor, the court would look at that guarantee, there are, I believe, four separate boxed-in blocks on that guarantee, on that — I'm sorry, on the application itself. But the application itself is not the only circumstance, or ambitia, for example, like all the ambitia that were considered in the American bank case cited by the appellee, that would shed light on the mindset of the putative surety Mr. Alford at the time he signed the documents. First, there were two separate applications. There was one the day before that was an application prepared by — or for dual trucking and transport with all kinds of information and data filled out about dual, saving the amount of credit requested, and the application signed by the CFO with no guarantee. That is not the document that was provided to Mr. Alford. Instead, tracker equipment sent not to Mr. Alford, but to dual in general, addressed Dear Sirs, a blank document filled in only with the name of the company and address of the company at the top. All of the things that had been omitted, including the signature of the CFO of the company, did not appear on that document. Sent it to him under — or sent it to the company under cover letter, Dear Sirs, not Dear Mr. Alford. And please have an owner or officer of the company sign the application. It didn't say personal guarantee. It does not say please sign the personal guarantee, Judge Clement. It refers to the personal guarantee not being signed, but then goes on to say please have an owner or officer sign the application. The application had been signed the previous day by the CFO of the company, except that the record is devoid of any information whatsoever or even any assertion that Mr. Alford knew that that had been done. And, in fact, if he knew that it had been done, why would he sign the document other than the application that had already been filled out? The better question would be why would tracker and equipment provide him with a document other than the one that had already been filled out? And that's what makes this case akin to the Pelican v. Mays case. I would point out in that case, the court found ambiguity regarding the intent of the punitive surety without any evidence from that surety, solely based on a document itself where the language was much more clear. One line, I agree to be bound and pay the debt of the company, a much more clear agreement than what we have here, which the trial court found our agreement had drafting errors in it, and I'll get to that in a moment. And there was no testimony or even affidavit from the surety in that case because he was dead before it came up. And the trial court, nonetheless, even with that clear language, said, well, when I look at these documents, there is a lot of company information, not a lot of personal information from the punitive surety filled into this document. We're going to take a look at this document. And without any testimony from the punitive surety, being deceased or anybody else, concluded the document itself was not sufficient. And I'd like to move on to that question. The trial court in our case found, without any evidence in the record or any argument from tractor equipment, and certainly not any evidence from tractor equipment, that the document itself, specific to the guarantee language, contained a drafting error. No one argued this, and there was no evidence presented in any of the affidavits or documents presented by tractor and equipment that this was, in fact, a drafting error. Now, the drafting error, and it's difficult to express or argue about the drafting error because the trial court, even though it found there was a drafting error in the limiting clause, failed to actually define what the drafting error was. Then apparently moved on to correct that drafting error without defining what the correction was, and then went on to apply the general rules after removing the part of the agreement that was unclear, apparently, went on to apply the general rules and adopt the analysis of the cases in line, the McKesson case, drawer, American Casualty v. Howard and Knox and others, that applied the general rules regarding contractual interpretation, saving the fact that those general rules would have required the trial court to apply the document as a whole, number 1, and according to Article 2058 of the Louisiana Civil Code, apply any ambiguity in the document against the drafter, tractor and equipment. What the trial court did in this case is eliminate the ambiguity, then apply the guarantee, saying that to not do so would lead to absurd consequences, but we would argue that that was a very significant error committed by the trial court for a couple of reasons. The first one is, if you eliminate all of the problems, the so-called drafting error or ambiguities in the guarantee, then, of course, it becomes more clear. But you're eliminating the general Article A of construing it against the drafter. We don't know what was eliminated. I'm sorry, Your Honor. We don't know what was eliminated, what ambiguity was eliminated. The trial court did not specifically define what was eliminated and what correction was being made. The trial court simply said there was a drafting error in the limiting clause and said that our view was myopic, which, by the way, I don't know if that was an observation or criticism, but I accept that because if myopic is the same as strict construction, then that's what's required. Surety is not favored in Louisiana, and these documents are supposed to be read strictly. And so we accept that view, but, of course, any document where you eliminate the drafting errors or problems or ambiguities is going to become more clear once you do it and more easy to apply. So what I'm saying is that the trial court said it was applying the general articles because to not do so and give effect to the document would lead to an absurd result, but then really didn't follow that analysis either, because she would — the trial court would have had to leave that ambiguity in the document and apply the document as a whole, and if that ambiguity could not be reconciled, it would have to be construed against the drafter, not eliminated from the document. What do you do with the language where it says the undersigned jointly and severally guarantees and agrees to pay? What we do, Your Honor, respectfully, is in that circumstance we keep reading, and the question becomes, what — and this was eliminated apparently by the trial court, but, of course, there's a question — three questions that would have to be answered in a circumstance like this. And I don't mean to belabor my answer. First, was there a valid guarantee? Secondly, if so, who guaranteed it? But then thirdly, what was guaranteed? Was it past debt, debt up to a certain point, future debt? In this situation, we have a grammar issue, and it says — and forgive me, but I've been looking at this case, as you might imagine, for a long time now, and I'm no grammar expert, and I don't — I'll leave the Court to decide how smart I am after I'm done with all of this, but I still don't know what this means. By reason of any credit you extended, past tense, as credit you extend, as herein requested, I don't know what that means. And whether that's some sort of legalese or not, I don't, frankly, know what it means. It seems to contradict itself in tense. Well, it says, in consideration of your giving credit to the aforesaid applicant, so that's — I mean, they're guaranteeing payment of that credit. Well, that would be why the guarantee — that would be why the guarantee would be given, but that would not define what the guarantee was of. How far did the guarantee extend? I don't see your problem. It would extend — how far did the guarantee extend? So the guarantee itself would have to be clear and explicit, according to Louisiana law, for it to be valid. I would submit to you that correcting drafting errors to omit ambiguities as to what is exactly guaranteed is exactly what is not required. It has to be clear and expressed according to case law, and even according to the Southern Fleet case, must be strictly construed. And so it's not just an issue of the language of the undersigned, you know, jointly and as the language that Your Honor read, but keep reading and define what is being guaranteed. And that part has to be understandable by the guarantor. Credit you extended as credit you extend as herein requested. All right. You've saved time for rebuttal, Mr. Fondren. Thank you, Your Honor. Riviere? May it please the Court, Christopher Riviere on behalf of Tractor and Equipment. Your Honor, I think I'm going to address some of my argument on what was last discussed first, and that is, when you look at this case as a whole, if there was any case that was ripe for a summary judgment, it was this case. Why? The reason is, is that Louisiana law, when you look at the suretyship law, doesn't require what the appellant suggests, and that is to have these strict requirements and twisted arguments to decide what the true meaning of a document means. But Mr. Fondren is right that surety is not favored in Louisiana, and you need to overcome that, what I'll call a presumption. That is correct. It is not favored, but you have to look for the intent of the parties. That's what the suretyship civil code articles that we've set forth require. When you look at it, we think that in the de novo review that Judge Fancebelow gave, it was considered. You looked at all of the language as well as the intent. In this particular case, Dual Trucking asked for credit. They wanted to have an open account to buy things from that business, and they filled out an application for credit. The one thing when it was submitted, it was signed by the applicant as the CFO of Mr. Robichaud. When it was reviewed that day, it was noted that the personal guarantee was not signed, and at that point, there was a letter sent by Mr. Grooms, and he noted that the personal guarantee was left blank. He didn't say you have to resubmit the whole thing. He said have an appropriate officer sign it. And in this particular case, so it could have been, in your view, any officer could have signed it? Well, they asked for an owner or an officer in the letter, and it's clear that Mr. Alford from the original application is an owner of the company. It disclosed that he had an ownership interest. But neither he nor anyone else was specifically listed in the letter? Not in the letter, no, sir. It was specific. And there's nothing in the record to indicate that the lender had any personal knowledge of the individual circumstances, financial circumstances of any of the officers. The letter is 18 in the record, and it does not indicate any specific person to sign, if that's what you're asking. Well, or any other, any individual financial information about any of the officers, whether they were solvent or whatever. That's correct, and at the time the letter was written, it was already disclosed that Mr. Alford was both an officer and an owner of the company. And so they send this document back, and it is not addressed in any other section other than to identify, when it says, when the appellant argues that it's a completely blank document, I respectfully disagree, because it referenced dual trucking, and dual trucking had submitted the day previous an application for credit with all of the information. So what do we have on the second one? What was the amount of the outstanding debt at the time? I'm sorry? What was the amount of the outstanding debt at the time, or was this sort of a whole new line of credit? This was in anticipation of giving credit. Had there been no prior credit extended? To my knowledge, no. And in this particular case, Mr. Alford . . . How long did it take to accrue a $200,000 debt? After the credit was extended, the bill was run, and then defaulted. I understand that, but how long did it take to get to $200,000? I just don't know anything about your business. It was over the course of a year, if I believe correct, but I really . . . I guess my question is the sense of what kind of liability was the person undertaking? You're picking up a document, you're signing on to a $200,000 liability, you pay pretty close attention to it. Well, I think, my interpretation of it is that this company intended to do business in that state, and it was in the oil field related services. It was going to be big money. But the point is that when you get to the request by Mr. Grooms, saying, hey, the personal guarantee was not signed. It doesn't matter, in my estimation, that you have to be specific about going further to say it. The attention was directed to whoever at Dual Trucking received that notice, that what's missing, the personal guarantee, and Mr. Alford went to the section in bold letters, personal guarantee. Now, he's a sophisticated businessman. It says personal guarantee. It's blocked off from the rest of it, and his signature appears there. One of the allegations that the appellant makes that is error is that the court failed to consider his affidavit or extrinsic evidence. At this point, I think the court did the appropriate review, and that is to look at the plain language, give it ordinary meaning, and determine whether the personal guarantee existed. Can you help us with what the district court excised as being a drafting error? Can you, you know, the drafting error, as in, that's been a... Your Honor, it was very hard for me to follow that because I think when you take the reasoning as a whole, the court looked at it and said, this is a clear intent to personal guarantee. It only goes into trying to come up with a drafting error when you go through all of the things that the appellant did about meanings and such, and that's not what Louisiana contract interpretation and it's not what the civil code requires a personal guarantee. But the district court, did the district court have in mind a particular drafting error, whether it's expression or what? I don't understand that. I'm, again, one thing my opposing counsel and I have in common, and that is we're probably not grammarians, but the best I could see is that maybe the court felt that it was using, when it talked about extended past tense, I think what they really said was that it was the present future tense. And that is, we're extending credit, this is what is to be extended to you. And so I think that would be the only drafting error I could concoct. But again, I don't think it goes to a critical determination de novo of whether or not Mr. Alford intended to be bound. If I may, for a little bit of my time, I would like to address some of the discussions about the jurisprudence. Clearly, we cited the Comar case in our brief. And Comar is a Fifth Circuit case coming out of the Western District of Louisiana. And I think that one is very analogous to the case that we have here, because it was a marine management contract, though. But in that case, the parties signed onto the agreement, and then at the end, there were agents of those parties who signed as guarantors of this agreement. And I think that's what you have in this particular case. You don't need, the Court didn't need in that particular case to go to extrinsic evidence. If Your Honors feel that you have to go to extrinsic evidence in this particular case, I want to point out one thing. And that is that there are two interpretations of what Mr. Alford suggested was his intent. The first one is in the record, and it's answers to interrogatories, where he said, this is my signature, but I have no specific recollection of what I signed. And then you have to compare that to the affidavit, which is in the record, that says, I thought I was signing in my official capacity on behalf of dual trucking. In every case that has been cited by the appellants, it is distinguishable on its fact, Your Honor. To give you an example, the Pelican plumbing case had one individual signing, and with company information following that signature for both the guarantee as well as the credit application. Pelican State Wholesale, which is the Mays case that was discussed earlier, that's one signature. And in that particular case, they were trying to enforce an amount due against a deceased person's widow and children. But in that case, there was only one signature for both agreements. Fleet Fuel was cited. That case is distinguishable. One person signed in two different blanks, but in each instance, they recorded the corporate identity and the official capacity. We do not have that in this case. In Eclipse Telecommunication, you had a guarantor sign, again, with the corporate information following. If Mr. Alford was, in fact, to say, I am personally guaranteeing this, I'm sorry, I am guaranteeing this on behalf of dual trucking, you get absurd consequences, which the jurisprudence says you don't do an interpretation. What does that mean? Why would the debtor become the surety? Is Comar your strongest case, your best case? I think all of our cases are strong, Your Honor, but Comar, I think, is very similar. Well, Mr. Fondren does a pretty good job of distinguishing Comar in his reply brief. Actually, this is exactly what a reply brief is supposed to do. It's shortened to the point, and here's what he says. In Comar Marine, the signature page contained the signatures of the principals to the credit contract, and right under those signatures were the signatures of the guarantors, who signed in blanks labeled with their printed names as well as the printed identification of, quote, guarantor. In fact, one of the guarantors had also signed separately for one of the principals to the credit contract. Is that an accurate representation of the facts in Comar? I think it's an accurate representation because there was just one word. Does that relate that it's my strongest case? No. What I think it shows is that even with a one-word pronouncement of guarantor, there is — a court can look at that term and that signature and say this is what they intended. In this case, the case at Boreana, it goes much further than that because if you look at the personal guarantee, it is clear and it's unequivocable that the signature is the agreement of the person to be bound to pay the sums that shall be extended as credit. And I think there is no twisted language in this agreement, and I think it is clear. It does not say anything — there is nothing to the contrary other than, well, maybe I don't understand what it says, but that's not what the law says when somebody signs a document that they have read it and that they understand it. I'll entertain any other questions that the panel may have. All right. Thank you, Mr. — Thank you very much. I'm sure. Okay.  Thank you, Your Honor. It is no surprise to me that the — Kelly would like the court to take an overall view, as they described with this case, because if you look closely, there are problems. There's problems with the agreement itself. If there wasn't, the trial court wouldn't have found undefined drafting errors that had to be corrected prior to applying it and deviated from both lines of reasoning in applying the document while writing out the ambiguity that should be construed against the drafter. The Fleet Fuel case very clearly supports opposition. The Fleet Fuel case, there were two separate signatures required. And in that case, there was company information, but a distinct lack of personal information of the guarantor filled in. That case cited Pelican Plumbing. And in fact, the putative surety was allowed a trial to test his credibility about what he intended when he signed the document. And in that case, the court accepted as credible that surety's — or putative surety's testimony. Now, I'll point out that in American Bank, the court didn't. But they got that opportunity because of the material issue of fact created by their prior testimony that they did not intend to sign that document personally. But what did the court do in that circumstance? Went through various — as Your Honors asked — personal financial statements from the person who was intended to sign the guarantee. In this case, they didn't intend Mr. Offord to sign the guarantee any more than he intended to sign a personal guarantee. It wasn't directed to him. They did no research regarding him, his ability to pay, no financial statements from him or anybody else with the company. There were no credit memos, no minutes of meetings or anything like this. Now, I realize the American Bank case involves a bank, which probably does business a little differently than an equipment company. But there's not even an analogous process that took place. Secondarily, the credit — the application that Mr. Offord signed in the language, credit extended as credit you extend, as herein requested. That document, the nearly blank — and we didn't say it was completely blank, but it only contained company information, no information relative to Mr. Offord specifically — that document neither referred to nor adopted the previous application that had been signed by the company's CFO. It didn't refer to it at all. Were there any demands for payment made after this debt became in arrears? There were, Your Honor. That information in the record is that the demands were made upon the company, and the But were the demands — when were the demands first directed toward the guarantor? My understanding, Your Honor, is when suit was filed against the guarantor. Actually, suit was filed against both the company and the guarantor in Montana State Court. The court in Montana, however, dismissed the claim on the personal guarantee against Mr. Offord for lack of personal jurisdiction, while doing so commenting that the court did not think very much of the surety agreement either. Of course, indicted because — Questions directed toward gaining understanding about the conduct of the parties in responding to not when they started the inception, but when the debt became — when the company got in trouble. This is all business. It might have been overnight, but — Yes, sir. So my understanding was that demand was made upon the company. When the company failed to respond, suit was filed against both the company and Mr. Offord in Montana. Your Honors, I'd like to conclude by saying we're asking the court to reverse the debt today, to give Mr. Offord his day in court, to, in fact, have his credibility tested as the plaintiffs in Pelican and the plaintiff in Fleet Fuel and — I'm sorry, the sureties — and, in fact, as the sureties who weren't found credible in American Bank. You asked the trier of the fact to answer. I'm sorry, Your Honor. What question would you ask the trier of the fact to answer? In fact, what was Mr. Offord's intent when signing this document? Do you find from opponents the evidence that Mr. Offord signed as a guarantor? I do not, based upon all the indicia that indicate otherwise. I'm just thinking that you want to go back for a trial. I'm curious as to how you would frame the question to the jury or the judge, for that matter. I would do so, Your Honor, by indicating and pointing out all these other circumstances that point to why he believed he was signing an application, such as the letter and everything else. Would you put it in terms of his belief, personal belief? His understanding. His understanding. Okay. All right. Thank you, Mr. Foundry. Your case is under submission. Thank you, Your Honor. The last case for today.